**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No.: ____________________**

| | | |
|---|---|---|
| **ROBERT ZULLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **COMPLAINT and DEMAND FOR JURY TRIAL** |
| **v.** | ) | |
| | ) | |
| **BANK OF AMERICA, N.A.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

Plaintiff, Robert Zullo ("Zullo"), by and through counsel, brings this action for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981"), the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*., the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12101 *et seq*., and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*., against Bank of America, N.A. ("Defendant").

**THE PARTIES**

1. Zullo is an adult individual who is a resident of Mooresville, North Carolina.

2. Defendant is a national banking association that maintains its principal place of business and corporate headquarters in Charlotte, North Carolina, including the Corporate Center located at 100 North Tryon Street, Charlotte, North Carolina, where Zullo was assigned.

## JURISDICTION AND VENUE

3. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 over the subject matter of the claims brought in violation of Title VII, Section 1981, the ADEA, the ADA, and the FMLA.

4. This Court has general personal jurisdiction over Defendant because Defendant maintains its principal place of business in Charlotte, North Carolina. In addition, the acts or omissions giving rise to Zullo's claims occurred in Mecklenburg County, North Carolina.

5. Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed in the State of North Carolina, specifically in Mecklenburg County, which lies within this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to Zullo's claims occurred in this judicial district.

## COVERAGE ALLEGATIONS

6. At all relevant times, Zullo was an "employee" covered by the protections of Title VII, within the meaning of 42 U.S.C. § 2000e(f).

7. Defendant is an "employer" engaged in an industry affecting commerce, with fifteen (15) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, within the meaning of 42 U.S.C. § 2000e(b).

8. At all relevant times, Zullo was an "employee" within the meaning of the ADEA, 29 U.S.C. § 630(f), and was at least forty (40) years of age.

9. At all relevant times, Defendant was an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b), engaged in an industry affecting commerce and employing twenty

(20) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

10. At all times relevant to this action, Zullo was a "qualified individual" covered by the protections of the ADA, as amended, within the meaning of 42 U.S.C. § 12111(8).

11. At all relevant times, Defendant was a "covered entity" engaged in an industry affecting commerce and had at least fifteen (15) employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, within the meaning of 42 U.S.C. § 12111(2) and (5).

12. At all relevant times, Zullo was an "employee" within the meaning of 42 U.S.C. § 12111(4).

13. At all relevant times, Defendant has been an "employer" within the meaning of the FMLA, in that Defendant employs fifty (50) or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year, 29 U.S.C. § 2611(4).

14. At all relevant times, Zullo was an "eligible employee" within the meaning of the FMLA, in that Defendant employed him for at least 12 months, and he performed at least 1,250 hours of service with Defendant during the 12-month period preceding his need for leave, 29 U.S.C. § 2611(2).

15. At all relevant times, Defendant employed at least fifty (50) employees within a seventy-five (75) mile radius of the location where Zullo worked.

16. Zullo satisfied his obligation to exhaust his administrative remedies by timely filing, on or about October 5, 2025, a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2025-04762, alleging discrimination and retaliation, including on the basis of race, on the basis of age, and on

the basis of his association with an individual with a disability. On July 27, 2026, the EEOC issued a Determination and Notice of Rights and Zullo timely brings this action within ninety (90) days of his receipt thereof.

## ZULLO'S FACTUAL ALLEGATIONS

17. Defendant is a national bank with more than 200,000 employees.

18. Zullo is a Caucasian male born on November 27, 1970.

19. Zullo began providing services to Defendant as a contractor through TEKsystems on or about July 5, 2018. On or about March 11, 2019, Zullo converted to a direct employee of Defendant with the title of Vice President.

20. In or around November 2021, Zullo became a Compliance and Operational Risk Manager. In or around 2022, Zullo was promoted to Senior Vice President. At the time of his separation, Zullo served as a Senior Vice President, Compliance and Operational Risk Manager, providing second-line-of-defense compliance and operational risk oversight for assigned global technology divisions. Zullo was assigned to Defendant's Corporate Center at 100 North Tryon Street in Charlotte, North Carolina.

21. Zullo served Defendant for approximately seven years before his separation.

22. In or around January 2022, Zullo began reporting directly to Karen A. Cheney ("Cheney"), Defendant's Compliance and Operational Risk Executive. Cheney reported to A.J. Venit ("Venit"). At all times referenced herein, Venit held the role of Senior Vice President, Global Compliance Operational Risk. Venit now serves as Defendant's Managing Director, Global Technology CRO and Compliance and Operational Risk. Cheney, Venit, and Zullo worked within Defendant's Global Compliance and Operational Risk organization.

23. At all relevant times, Zullo met or exceeded Defendant's legitimate employment expectations. Zullo received consistent "Meets Expectations" performance ratings or better for each year of his employment, received annual cash bonuses and stock awards, and received a performance award from Cheney in or around May 2025. Zullo received no disciplinary action until the discipline that is the subject of this Complaint.

24. In or around January 2025, Defendant assigned Zullo additional technology risk coverage for its global Human Resources group, and in or around May 2025, Zullo volunteered to absorb the coverage of a retiring colleague, adding further responsibilities.

25. Zullo's mother resides in upstate New York and is his only surviving immediate family member. During the relevant period, Zullo's mother had a serious health condition that required Zullo's caregiving involvement, including travel to and attendance at her medical appointments and therapy. At the time of Zullo's August 2025 leave and My Work requests, his mother had physical and mental impairments affecting her cognitive function and her vision. Those impairments substantially limited her major life activities, including caring for herself, seeing, reading, walking, concentrating, thinking, learning, communicating, and interacting with others, and substantially limited the operation of her major bodily functions, including neurological function, brain function, and the function of her special sense organs. Her impairments limited her mobility. She could not drive, and her children did not permit her to drive, so she depended on others to transport her to and from her medical care. Her conditions required extensive outpatient treatment, including daily doctor's appointments over a period of six months scheduled to begin in September 2025, and constituted a serious health condition involving continuing treatment by a health care provider.

26. In or around May 2024, Zullo informed Cheney that he needed to be near his mother to assist with her care. On or about June 3, 2024, Cheney submitted a request on Zullo's behalf through Defendant's "My Work" flexibility program. Cheney's submission stated that Zullo "has a personal hardship situation which will impact his ability to badge into the office 3 times per week over the next 4-5 months," and that "he has an elder care issue with his mother, who lives in upstate New York. Her current medical situation will require Robert to be back and forth between NY and NC several times in June through likely October."

27. On or about June 7, 2024, HR Consultant Scott Pierson ("Pierson") interviewed Zullo about the My Work request. On or about June 27, 2024, Defendant denied the application on the ground that Zullo did not live in the same household as his mother, and Pierson instructed Zullo to "work with your manager to discuss other flexibility options."

28. On or about July 27, 2024, Cheney verbally authorized an alternative arrangement under which Zullo would badge into Defendant's Albany, New York office to satisfy Defendant's badging requirement while continuing to perform his Charlotte-based role. Defendant provisioned Zullo's access to the Albany office through its building-access systems.

29. For approximately twelve months thereafter, Zullo used the Albany office intermittently and was consistently marked as compliant on Defendant's weekly manager dashboard. During that period, Zullo received no reprimand, counseling, or warning regarding his attendance or location, and he received expanded responsibilities and a performance award.

30. Other employees within the same management chain were permitted to work remotely or from alternate locations through informal, verbal arrangements for family-care reasons, without using the My Work process and without discipline.

31. Daniel Williams ("Williams"), an African-American male in Venit's organization, was permitted to relocate permanently from Charlotte to New Jersey, a move necessitated by the needs of a dependent. As a member of Venit's and Cheney's department, Williams could relocate only with the approval of Venit and Cheney, which he received. Cheney and Venit approved Williams's relocation outside the My Work process, just as Cheney had approved Zullo's Albany arrangement outside that process in July 2024. Williams did not use the My Work process, was not required to report to any office in New Jersey, and received no discipline. Williams's last day in the Charlotte office was on or about August 8, 2025. Williams was subsequently promoted to Senior Vice President. Upon information and belief, Williams was between thirty and thirty-nine years old. He was substantially younger than Zullo and outside the class protected by the ADEA.

32. Ben Hardaman, a peer under Venit, was permitted to work remotely for dependent care beginning in or around January 2023 through a verbal arrangement, regularly working away from the Charlotte office for extended periods, without using the My Work process and without discipline. Upon information and belief, Hardaman was between forty and forty-five years old and substantially younger than Zullo.

33. Venit disparaged Defendant's formal My Work process in Zullo's presence, stating that it allowed employees to do whatever they want, and he permitted employees in his organization to bypass that process through informal arrangements. Yet when Zullo sought flexibility to care for his mother, Venit invoked the same formal process against him, refusing to allow Zullo's My Work application to reach committee and treating the absence of formal My Work approval as grounds to discipline him.

34. Upon information and belief, Defendant's senior managers, including Cheney and Venit, operated under a compensation structure that tied a portion of their annual bonus incentives

to diversity-target percentages within their teams. Zullo's compensation structure follows the same pattern requiring a portion of his annual bonus incentive to diversity target percentages, which is applicable across Zullo's work level.

35. At the time of the events described in this Complaint, Zullo was fifty-four (54) years old.

36. Upon information and belief, the diversity-target metrics tied to Cheney's and Venit's incentive compensation included categories tracked through Defendant's Employee Resource Groups spanning race, gender, age, sexual orientation, disability, and veteran status. Zullo's demographic profile did not add to those metrics, while the profile of Williams, an African-American employee, did.

37. Defendant enforced its attendance and flexibility policies rigidly against Zullo, a fifty-four-year-old Caucasian employee, while giving employees in the same management chain who were substantially younger or of a different race informal arrangements for materially similar or more extensive departures from the in-office requirement.

38. On or about August 6, 2025, Cheney contacted Defendant's Employee Relations department seeking data to support a verbal warning to Zullo. Cheney acknowledged that Zullo was "consistently marked as compliant on the weekly manager dashboard," but stated that she wished to warn him about not coming into the office and needed "additional facts and data supporting that he is not meeting the requirement of 3 days a week (and perhaps for at least 6-7 hours per day), as the current reporting indicates compliance."

39. On or about August 8, 2025, Zullo emailed Cheney notifying her of his intent to apply for My Work or temporary leave to care for his mother, whose treatments in New York were to begin in September 2025.

40. Zullo's August 8, 2025 email gave Defendant notice that he needed leave for a reason that may qualify under the FMLA. Defendant did not provide Zullo with a notice of eligibility for FMLA leave or a notice of his rights and responsibilities under the FMLA within five business days of that email, or at any time before his resignation.

41. On or about August 12, 2025, Zullo submitted a second My Work application, this time seeking to relocate his assigned work location to the Albany office and to live with his mother, which directly addressed the stated basis for the 2024 denial. Defendant's system auto-routed the application to both Cheney and Venit.

42. On or about August 13, 2025, Defendant issued Zullo a "Letter of Education, Policy and Procedure Violation" (the "Letter of Education"). The Letter of Education stated that the expectation for Zullo's role was that he "work at least 3 full days per week in [his] assigned Charlotte office location," acknowledged that Zullo was "marked as compliant on the weekly manager dashboard tracking badge swipes," and stated that Employee Relations' research showed that Zullo swiped his badge at the Albany, New York location and connected remotely from non-bank residential locations. The Letter of Education stated no hourly minimum.

43. On or about August 14, 2025, Zullo's regular one-on-one meeting with Cheney was converted, without advance notice, into a meeting in Venit's office attended by both Venit and Cheney. During the meeting, Venit accused Zullo of using the Albany office without permission, stated that he would not allow any My Work application to reach committee, and dismissed Zullo's caregiving explanation without offering any alternative. Venit told Zullo that he would be "gone in 30 days, we just have to follow the paperwork process," that in Venit's former department Zullo would be "fired today," and that Zullo "would never work in the banking industry again." Cheney declined Zullo's request that she confirm the arrangement she had authorized.

44. On or about August 15, 2025, Zullo filed an ethics and compliance complaint through Defendant's NAVEX/EthicsPoint platform opposing the disparate and unequal treatment he had experienced, including the unequal application of Defendant's attendance, leave, and flexibility policies as compared to other employees in his department. Defendant's internal computer systems automatically notified Cheney and Venit that a complaint had been lodged against them. Defendant's internal policy required that all pending employment actions be paused upon the initiation of such a complaint. Zullo, by virtue of his position with ownership over the HR Systems Compliance, is aware that upon the initiate of a complaint, Defendant's systems will process through its HR department a statement to supervisors that are the subject of a complaint that a complaint has been made about them, the general subject of the complaint including complaints of discrimination on the basis of race and age, and instructing the supervisor to halt all pending employment actions. The disparate treatment Zullo identified included discrimination on the basis of race and age, including the more favorable treatment of a younger employee.

45. On or about August 19, 2025, Cheney, in a meeting attended by Venit, presented Zullo with a Performance Improvement Plan ("PIP") citing "low performance and lack of productivity." The PIP stated that "TERMINATION CAN TAKE PLACE AT ANY TIME." Venit and Cheney reiterated that the PIP was the "paperwork" referenced in the August 14, 2025 meeting. Upon the issuance of the PIP, Defendant cancelled Zullo's pending My Work application before it reached committee review. As an automatic result of the PIP, Zullo's ability to apply for FMLA leave, temporary leave, and internal transfers was blocked in Defendant's human resources systems. But for that block, Zullo would have taken leave beginning in September 2025 to care for his mother.

46. The PIP rested on a different rationale from the one Defendant had given before Zullo's complaint. The Letter of Education and the August 14, 2025 meeting addressed where Zullo worked. The PIP, issued after the complaint, addressed how well he worked, although Zullo had received ratings of "Meets Expectations" or better every year, expanded responsibilities in 2025, and a performance award from Cheney in or around May 2025.

47. Defendant did not pause the PIP after Zullo's complaint, as its policy required. Cheney and Venit issued the PIP four days after Defendant's systems notified them of the complaint.

48. On or about August 20, 2025, Zullo resigned by email. By that date, Venit had told Zullo that he would be gone in thirty days, Venit and Cheney had confirmed that the PIP was the paperwork to accomplish that result, Venit had told Zullo that he would never work in the banking industry again, and Defendant had blocked the leave Zullo needed to care for his mother when her treatments began in September 2025. Completing the PIP could not change the outcome Venit had announced. A reasonable person in Zullo's position would have felt compelled to resign. Zullo resigned approximately four months before he would have qualified for substantial retirement vesting and equity benefits.

49. As an actual, proximate, and foreseeable result of Defendant's conduct, Zullo suffered lost back and front pay, lost benefits associated with his employment, including retirement and equity benefits, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, humiliation, and harm to his career and reputation.

## FIRST CAUSE OF ACTION
## (Violation of Title VII - Discrimination based on Race)

50. Zullo realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

51. Zullo is Caucasian and is therefore a member of a class protected by Title VII.

52. Defendant unlawfully discriminated against Zullo because of his race by subjecting him to discipline, a PIP, and constructive discharge, while treating similarly situated employees of a different race, including Williams, more favorably with respect to attendance, remote-work, and flexibility arrangements.

53. Each of the following, standing alone, constitutes an independent adverse employment action: (a) Defendant's issuance of the Letter of Education; (b) Defendant's cancellation of Zullo's My Work application; (c) Defendant's issuance of the PIP; and (d) Defendant's blocking of Zullo's ability to apply for FMLA leave, temporary leave, and internal transfers.

54. Defendant engaged in the discriminatory practices described above with malice or with reckless indifference to Zullo's federally protected rights, within the meaning of 42 U.S.C. § 1981a(b)(1).

55. As an actual, proximate, and foreseeable result of Defendant's actions, Zullo suffered lost back and front pay, lost benefits associated with his employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

**SECOND CAUSE OF ACTION**
**(Violation of Title VII - Retaliation for Opposing Race Discrimination)**

56. Zullo realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

57. Zullo engaged in activity protected by Title VII in that he filed an ethics and compliance complaint through Defendant's NAVEX/EthicsPoint platform opposing the disparate and unequal treatment he experienced, which he reasonably and in good faith believed to include discrimination on the basis of race.

58. Zullo had a reasonable, good faith belief that the conduct he opposed violated Title VII.

59. Defendant retaliated against Zullo by issuing him a PIP, blocking his access to leave and transfer options, and constructively discharging him because he engaged in protected activity. Defendant issued the PIP after it learned of Zullo's complaint, in disregard of its policy requiring that pending employment actions be paused, and the PIP rested on a performance rationale Defendant had not raised before the complaint.

60. Each of the following, standing alone, constitutes an independent materially adverse action that would dissuade a reasonable employee from making or supporting a charge of discrimination: (a) Defendant's cancellation of Zullo's My Work application; (b) Defendant's issuance of the PIP; and (c) Defendant's blocking of Zullo's ability to apply for FMLA leave, temporary leave, and internal transfers.

61. Defendant engaged in the retaliatory practices described above with malice or with reckless indifference to Zullo's federally protected rights, within the meaning of 42 U.S.C. § 1981a(b)(1).

62. As an actual, proximate, and foreseeable result of Defendant's actions, Zullo suffered lost back and front pay, lost benefits associated with his employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

## THIRD CAUSE OF ACTION
## (Violation of Section 1981 - Race Discrimination)

63. Zullo realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

64. Zullo is Caucasian and is therefore protected by Section 1981 from intentional discrimination on the basis of race.

65. Zullo had an employment contract with Defendant. Under that contract, Zullo performed services for Defendant in exchange for compensation, annual cash bonuses, stock awards, and retirement and equity benefits, and he was entitled to the benefits, privileges, terms, and conditions of his employment, including access to Defendant's My Work flexibility program, leave, and internal transfers, within the meaning of 42 U.S.C. § 1981(b).

66. Defendant unlawfully discriminated against Zullo because of his race in the performance, modification, and termination of his employment contract, and in the enjoyment of its benefits, privileges, terms, and conditions, by subjecting him to the Letter of Education, cancellation of his My Work application, blocking of his leave and transfer options, a PIP, and constructive discharge. During the same period, Defendant treated similarly situated employees of a different race, including Williams, more favorably with respect to attendance, remote-work, relocation, and flexibility arrangements.

67. Each of the following, standing alone, constitutes an independent adverse employment action: (a) Defendant's issuance of the Letter of Education; (b) Defendant's cancellation of Zullo's My Work application; (c) Defendant's issuance of the PIP; and (d) Defendant's blocking of Zullo's ability to apply for FMLA leave, temporary leave, and internal transfers.

68. But for Zullo's race, Defendant would not have taken the adverse actions described above. Defendant's own weekly manager dashboard showed Zullo in compliance with the badging requirement. Cheney and Venit approved Williams's permanent relocation outside the My Work process, just as Cheney had approved Zullo's Albany arrangement outside that process, yet Defendant disciplined Zullo and not Williams. Venit disparaged the My Work process and permitted employees in his organization to bypass it, yet invoked that process against Zullo. Upon

information and belief, Cheney's and Venit's incentive compensation was tied to diversity-target metrics to which Williams's demographic profile contributed and Zullo's did not.

69. Cheney and Venit acted within the scope of their employment and in a managerial capacity in connection with the adverse actions described above.

70. Defendant engaged in the discriminatory practices described above with malice or with reckless indifference to Zullo's federally protected rights, entitling Zullo to punitive damages under Section 1981.

71. As an actual, proximate, and foreseeable result of Defendant's actions, Zullo suffered lost back and front pay, lost benefits associated with his employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

**FOURTH CAUSE OF ACTION**
**(Violation of the ADEA - Age Discrimination)**

72. Zullo realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

73. At all relevant times, Zullo was over forty (40) years of age and therefore a member of the class protected by the ADEA.

74. At all relevant times, Zullo was qualified for his position and met or exceeded Defendant's legitimate employment expectations, as shown by his consistent performance ratings, promotion to Senior Vice President, expanded responsibilities, and May 2025 performance award.

75. Defendant unlawfully discriminated against Zullo because of his age by subjecting him to the Letter of Education, cancellation of his My Work application, blocking of his leave and transfer options, a PIP, and constructive discharge. During the same period, Defendant treated substantially younger, similarly situated employees, including Williams and Hardaman, more favorably with respect to attendance, remote-work, relocation, and flexibility arrangements.

76. Each of the following, standing alone, constitutes an independent adverse employment action: (a) Defendant's issuance of the Letter of Education; (b) Defendant's cancellation of Zullo's My Work application; (c) Defendant's issuance of the PIP; and (d) Defendant's blocking of Zullo's ability to apply for FMLA leave, temporary leave, and internal transfers.

77. But for Zullo's age, Defendant would not have taken the adverse actions described above.

78. Defendant's violation of the ADEA was willful, entitling Zullo to liquidated damages.

79. As an actual, proximate, and foreseeable result of Defendant's actions, Zullo suffered lost back and front pay and lost benefits associated with his employment, including retirement and equity benefits.

**FIFTH CAUSE OF ACTION**
**(Violation of the ADEA - Retaliation)**

80. Zullo realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

81. Zullo engaged in activity protected by the ADEA. He filed an ethics and compliance complaint through Defendant's NAVEX/EthicsPoint platform opposing disparate and unequal treatment, including more favorable treatment of a younger employee, which he reasonably and in good faith believed to include discrimination on the basis of age.

82. Defendant retaliated against Zullo because he engaged in protected activity. Four days after the complaint, Defendant issued him a PIP. It also blocked his access to leave and transfer options and constructively discharged him. Defendant issued the PIP after it learned of

Zullo's complaint, in disregard of its policy requiring that pending employment actions be paused, and the PIP rested on a performance rationale Defendant had not raised before the complaint.

83. Each of the following, standing alone, constitutes an independent materially adverse action that would dissuade a reasonable employee from making or supporting a charge of discrimination: (a) Defendant's cancellation of Zullo's My Work application; (b) Defendant's issuance of the PIP; and (c) Defendant's blocking of Zullo's ability to apply for FMLA leave, temporary leave, and internal transfers.

84. Defendant's violation of the ADEA was willful.

85. As an actual, proximate, and foreseeable result of Defendant's actions, Zullo suffered lost back and front pay and lost benefits associated with his employment.

## <u>SIXTH CAUSE OF ACTION</u>
## (Violation of the ADA - Associational Disability Discrimination)

86. Zullo realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

87. At all relevant times, Zullo had a known relationship and association with an individual with a disability, namely his mother, who had physical and mental impairments affecting her cognitive function and her vision that substantially limited her major life activities, including caring for herself, seeing, reading, walking, concentrating, thinking, learning, communicating, and interacting with others, and the operation of her major bodily functions, including neurological function, brain function, and the function of her special sense organs, within the meaning of 42 U.S.C. § 12102(1)–(2) and 29 C.F.R. § 1630.2(h)–(j).

88. Defendant knew of Zullo's association with his disabled mother, including through Cheney's June 3, 2024 My Work submission describing the elder-care situation, the 2024

interview and denial process, Zullo's regular updates regarding his caregiving, and his August 8, 2025 notice and August 12, 2025 application identifying his mother's care as the purpose.

89. Defendant unlawfully discriminated against Zullo because of his known association with an individual with a disability by subjecting him to the Letter of Education, a PIP, and constructive discharge, based on assumptions about his availability tied to his caregiving relationship, in violation of 42 U.S.C. § 12112(b)(4).

90. Cheney and Venit knew of Zullo's mother's condition and of his role in her care. Cheney's own June 3, 2024 My Work submission described "an elder care issue with his mother" and a "current medical situation" that would require Zullo "to be back and forth between NY and NC," and Cheney authorized the Albany arrangement in July 2024 so that Zullo could assist with that care. Zullo's August 8, 2025 email to Cheney identified his mother's care and her treatments beginning in September 2025 as the reason he needed leave or a My Work arrangement, and his August 12, 2025 application, which Defendant's system routed to Cheney and Venit, sought to relocate him to the Albany office so that he could live with his mother.

91. Zullo's mother's disability caused his need for a different work location. Each request Zullo made to work from New York, in 2024 and in August 2025, rested on her care. Defendant tolerated the Albany arrangement for approximately twelve months without reprimand, while Zullo was marked compliant on the weekly manager dashboard and received expanded responsibilities and a performance award. Defendant changed course within days after Zullo disclosed that his mother's treatments would require his presence in New York for an extended period. Defendant issued the Letter of Education the day after Zullo applied to relocate to Albany to live with his mother. The following day, Venit dismissed Zullo's caregiving explanation without offering any alternative, refused to allow any My Work application to reach committee,

and told Zullo that he would be "gone in 30 days." Defendant presented the PIP five days later. Upon issuing the PIP, Defendant cancelled Zullo's My Work application, and the PIP automatically blocked the leave Zullo needed to care for his mother. Because Defendant's own dashboard showed Zullo in compliance with the badging requirement, his attendance does not explain these actions.

92. Each of the following, standing alone, constitutes an independent adverse employment action: (a) Defendant's issuance of the Letter of Education; and (b) Defendant's issuance of the PIP.

93. Defendant engaged in the discriminatory practices described above with malice or with reckless indifference to Zullo's federally protected rights, within the meaning of 42 U.S.C. § 1981a(b)(1).

94. As an actual, proximate, and foreseeable result of Defendant's actions, Zullo suffered lost back and front pay, lost benefits associated with his employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

## <u>SEVENTH CAUSE OF ACTION</u>
## (Violation of the FMLA - Interference)

95. Zullo realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

96. Zullo was entitled to leave under the FMLA to care for his mother, who had a serious health condition within the meaning of 29 U.S.C. § 2611(11) and 29 C.F.R. §§ 825.113–.115.

97. Zullo provided Defendant with notice of his intent to take FMLA-qualifying leave, including through his August 8, 2025 email to Cheney notifying her of his intent to apply for leave to care for his mother, whose treatments were to begin in September 2025.

98. Defendant unlawfully interfered with, restrained, and denied the exercise of Zullo's rights under the FMLA by, among other things, failing to provide him with required eligibility and rights notices, blocking his ability to apply for FMLA leave in Defendant's human resources systems, and constructively discharging him rather than permitting him to take protected leave.

99. Each of the following, standing alone, independently interfered with, restrained, or denied the exercise of Zullo's rights under the FMLA: (a) Defendant's issuance of the PIP; and (b) Defendant's blocking of Zullo's ability to apply for FMLA leave, temporary leave, and internal transfers.

100. Defendant's interference prejudiced Zullo. But for the block on his ability to apply for FMLA leave, Zullo would have taken leave beginning in September 2025 to care for his mother and would not have resigned.

101. Defendant's actions were intentional, willful, and/or undertaken with reckless disregard for Zullo's rights under the FMLA.

102. As an actual, proximate, and foreseeable result of Defendant's actions, Zullo suffered lost back and front pay and lost benefits associated with his employment.

## EIGHTH CAUSE OF ACTION
**(Violation of the FMLA - Retaliation)**

103. Zullo realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

104. Zullo engaged in activity protected by the FMLA by providing notice of his intent to take, and by attempting to take, FMLA-qualifying leave to care for his mother.

105. Defendant retaliated against Zullo by issuing him a PIP, blocking his access to leave and transfer options, and constructively discharging him because he sought to exercise his rights under the FMLA.

106. Each of the following, standing alone, constitutes an independent materially adverse action that would dissuade a reasonable employee from exercising rights under the FMLA: (a) Defendant's cancellation of Zullo's My Work application; (b) Defendant's issuance of the PIP; and (c) Defendant's blocking of Zullo's ability to apply for FMLA leave, temporary leave, and internal transfers.

107. Defendant's actions were intentional, willful, and/or undertaken with reckless disregard for Zullo's rights under the FMLA.

108. As an actual, proximate, and foreseeable result of Defendant's actions, Zullo suffered lost back and front pay and lost benefits associated with his employment.

## **PRAYER FOR RELIEF**

WHEREFORE, Zullo demands the following relief:

a. A Declaration and finding that Defendant violated provisions of Title VII by discriminating against Zullo because of his race;

b. A Declaration and finding that Defendant violated provisions of Title VII by retaliating against Zullo because he engaged in protected activity opposing race discrimination;

c. A Declaration and finding that Defendant violated Section 1981 by discriminating against Zullo because of his race in the performance, modification, and termination of his employment contract and in the enjoyment of its benefits, privileges, terms, and conditions;

d. A Declaration and finding that Defendant willfully violated provisions of the ADEA by discriminating against Zullo because of his age;

e. A Declaration and finding that Defendant willfully violated provisions of the ADEA by retaliating against Zullo because he engaged in protected activity;

f. A Declaration and finding that Defendant violated provisions of the ADA by discriminating against Zullo because of his known association with an individual with a disability;

g. A Declaration and finding that Defendant willfully violated provisions of the FMLA by interfering with, restraining, and denying the exercise of Zullo's rights as protected by the FMLA;

h. A Declaration and finding that Defendant willfully violated provisions of the FMLA by retaliating against Zullo because he sought to exercise his rights as protected by the FMLA;

i. An Order requiring Defendant to pay Zullo for all lost wages, bonuses, and employment benefits from the day Defendant unlawfully discriminated and retaliated against him until the day of final judgment;

j. An Order requiring Defendant to reinstate Zullo to the position from which he was constructively discharged or award front pay in lieu thereof;

k. An Order requiring Defendant to pay Zullo liquidated damages pursuant to 29 U.S.C. § 626(b) for Defendant's violations of the ADEA and 29 U.S.C. § 2617(a)(1)(A)(iii) for Defendant's violations of the FMLA;

l. An Order requiring Defendant to pay Zullo compensatory damages under 42 U.S.C. § 1981a(a) for Defendant's violations of Title VII and the ADA, and under Section 1981, without regard to the limitations of 42 U.S.C. § 1981a(b)(3), for Defendant's violation of Section 1981;

m. An Order requiring Defendant to pay Zullo punitive damages under 42 U.S.C. § 1981a(b)(1) for Defendant's violations of Title VII and the ADA, and under Section

1981, without regard to the limitations of 42 U.S.C. § 1981a(b)(3), for Defendant's violation of Section 1981;

n. An Order requiring Defendant to pay Zullo all attorneys' fees, litigation expenses, and costs incurred as a result of bringing this action, including under 42 U.S.C. § 1988(b);

o. An Order requiring Defendant to pay Zullo pre- and post-judgment interest at the highest rates allowed by law on all sums recoverable; and

p. An Order granting such other and further relief as may be necessary and appropriate.

**JURY TRIAL DEMAND**

Zullo demands a trial by jury for all issues of fact.

Dated: October 23, 2026.

Respectfully submitted,

s/ Evan Gungor

Evan Gungor, NCSB #60902
**GIBBONS LAW GROUP, PLLC**
1144 Executive Circle, Ste 220
Cary, NC 27511
704-612-0038 Office
919-706-0211 Direct
evan@gibbonslg.com

*Attorney for Plaintiff Robert Zullo*